[No. B182553. Second Dist., Div. Two. Jan. 11, 2006.]

MAURA MONTERROSO, Plaintiff and Appellant, v.
MARIO LOPEZ MORAN, Defendant and Respondent.

**COUNSEL**

Legal Aid Foundation of Los Angeles and Jane S. Preece for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

**OPINION**

**ASHMANN-GERST, J.**—Maura Monterroso (Monterroso) appeals an order entering a mutual restraining order enjoining her and her husband, Mario Lopez Moran (Moran), from specific acts of abuse. She argues that the trial court failed to make detailed findings, as required by Family Code section 6305,[1] that both parties acted primarily as aggressors and neither acted primarily in self-defense in a past incident. We hold that unless a trial court makes the detailed findings required by section 6305, it acts in excess of its jurisdiction by entering a mutual restraining order.

We reverse.

## FACTS

Monterroso and Moran are married, they used to live together, and they have minor children together. In the proceeding below, Monterroso sought temporary restraining orders against Moran under the Domestic Violence Prevention Act.[2] She requested that the trial court order Moran not to harass or contact her or her children, and to stay at least 100 yards away. She also requested that the trial court order Moran to attend a batterer intervention program, and that he not borrow against, sell or destroy any possessions or property.

Her application detailed the following facts: She and Moran separated in August 2004. Once he found out where she was living, he came into her home without permission and threatened their children, telling them that they needed to come see him. In October of that year, because he was angry at their 16-year-old daughter for having a boyfriend, he told Monterroso and their 13-year-old daughter that "you are going to die." He was driving

---

[1] All further statutory references are to the Family Code unless otherwise indicated.

[2] Section 6200 et seq.

Monterroso's car at the time. When she tried to get the keys, he grabbed her arm and left bruises. A few days later, when she went to pick up her son from a babysitter across the street from Moran's house, Moran showed her a knife, pointed it at several areas of his body and said that he would hurt himself to show his love for her. Moran accused Monterroso of having an affair with a friend that was giving Monterroso a place to stay. Subsequently, she found videotapes that Moran took of her without her knowledge.

On January 1, 2005, Moran came to her house and began verbally abusing her. He was upset that she would not move back in with him and told her that she was trash. He took her keys, car, wallet and house-cleaning materials that she uses for her job. A few days later she went to Moran's house to retrieve her house-cleaning materials from her car. He grabbed her by the hair, dragged her into his house and told her that he was going to kill her. Then he covered her face with a pillow. After she struggled to get free, he put his hand on her throat and choked her. He picked her up by her hair and hit her head on a heater. He slapped her. She ended up with a cut lip and a chipped tooth. When she screamed, he stuck his hand in her mouth and scratched the roof of her mouth. He went to the kitchen and she ran outside to where her daughter was waiting and called the police. After the police arrived, she was told that Moran had already called and accused her of trying to kill him. Moran had apparently cut his chest with a knife. Both Monterroso and Moran were arrested. Eventually, Moran admitted that Monterroso had not tried to kill him. She was released.

Attached to Monterroso's application was a copy of an emergency protective order issued the date Moran was arrested. The emergency protective order lasted four days and instructed Moran not to contact or harass Monterroso. It instructed him to stay at least 100 yards away from her.

Moran filed an answer.

The matter came on for hearing. Moran was represented by ·counsel, but Monterroso was not. Both parties were assisted by a Spanish-language interpreter.

According to the trial court, it read Monterroso's papers, but it did not read Moran's answer. The reason given for not reading Moran's answer was that he had been arrested and the trial court wanted to respect his constitutional right to remain silent in case he was charged with a crime.

When the trial court asked if the matter could be resolved, Moran's counsel indicated that the parties went to conciliation court that very morning and had agreed to make the restraining orders mutual, but they could not agree on child custody and visitation. The trial court asked Monterroso if she would be agreeable to mutual restraining orders. She said "yes."

The trial court altered the proposed restraining order submitted by Monterroso to make it mutual. Each party signed it. The altered order prohibited each party from, inter alia, harassing, attacking, striking, threatening, assaulting, or stalking the other, or from destroying the personal property of the other, for a period of six months. Thereafter, the order was entered.

The trial court made no findings of fact.

This timely appeal followed.[3]

## DISCUSSION

This case presents the following question: Is reversal required if the trial court did not make the detailed findings of fact required by section 6305? This is a question of law. We review questions of law de novo. (*Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 779–780 [127 Cal.Rptr.2d 104].)

■ We begin with the statutory scheme at issue. Section 6305 provides that a "court may not issue a mutual order enjoining the parties from specific acts of abuse described in Section 6320 (a) unless both parties personally appear and each party presents written evidence of abuse or domestic violence and (b) the court makes detailed findings of fact indicating that both parties acted primarily as aggressors and that neither party acted primarily in self-defense." ■ Section 6320 permits a court to issue an ex parte order enjoining a party from "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, annoying telephone calls . . . , destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party."

■ The language of section 6305 is clear and its plain meaning must be respected. (*In re Marriage of Dupre* (2005) 127 Cal.App.4th 1517, 1525–1526 [26 Cal.Rptr.3d 328].) A trial court has no statutory power to issue a mutual order enjoining parties from specific acts of abuse described in section 6320 without the required findings of fact. When a trial court issues such an order in contravention of its statutory obligation to make the required findings of fact, it acts in excess of its jurisdiction. (See *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 291 [109 P.2d 942].)

Having agreed to the mutual restraining order, the question arises whether Monterroso can challenge it on appeal.

---

[3] Moran did not file a respondent's brief. We resolve this appeal pursuant to California Rules of Court, rule 17(a)(2).

■ Our Supreme Court recently summarized the pertinent body of law this way: " ' "[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction." ' [Citation.] When a court has fundamental jurisdiction, but acts in excess of its jurisdiction, its act or judgment is merely voidable. [Citations.] That is, its act or judgment is valid until it is set aside, and a party may be precluded from setting it aside by 'principles of estoppel, disfavor of collateral attack or res judicata.' [Citation.]" (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 661 [16 Cal.Rptr.3d 76, 93 P.3d 1020].)

■ Similarly, it has been noted that there " 'seems to be substantial authority for the proposition that a party who has invoked or consented to the exercise of jurisdiction beyond the court's authority may be precluded from challenging it afterwards, even on a direct attack by appeal.' [Citation.] 'The circumstances of a particular case may be such as to estop a person from setting up the invalidity of a judgment.' " (*Munns v. Stenman* (1957) 152 Cal.App.2d 543, 558 [314 P.2d 67].)

There is nothing in the record suggesting that the principles of estoppel bar this direct appeal. We note that Monterroso cleans houses for a living. She appeared at the hearing without representation and needed a Spanish-language interpreter. She did not display any legal sophistication. Though the trial court asked if she was amenable to a mutual restraining order, the trial court did not ask her if she understood that a mutual restraining order required a detailed finding that both parties acted primarily as aggressors and not primarily in self-defense during a prior incident. Nor did the trial court ask her to stipulate to such facts. Because the trial court did not fully explain the import of a mutual restraining order, there is no indication that Monterroso could appreciate all of its ramifications. Under these circumstances, it cannot be said that Monterroso consented to the mutual restraining order such that she is estopped from seeking redress on appeal.

■ As the court in *Conness v. Satram* (2004) 122 Cal.App.4th 197 [18 Cal.Rptr.3d 577] pointed out, the original version of section 6305 required the parties to present written evidence unless they agreed that the requirement did not apply. But then the "1995 amendment eliminated the waiver provision and added a requirement that the court make detailed factual findings supporting the conclusion that both parties acted primarily as aggressors and neither acted primarily in self-defense. (Stats. 1995, ch. 246, § 2, p. 852.) This amendment helps ensure that a mutual order is the product of the careful evaluation of a thorough record and not simply the result of the moving party yielding to the other party's importunities or the court deciding that a mutual order is an expedient response to joint claims of abuse." (*Conness v. Satram, supra,* at p. 204.)

This quote has particular resonance. Monterroso was never informed that she had every right to insist that the trial court rule on the merits of her application for restraining orders against Moran. At the hearing, it was Moran's counsel who brought up the idea of a mutual restraining order. The trial court did not inquire about the allegations of terrible domestic violence in Monterroso's application. Instead, it expressed concern over protecting Moran's constitutional right against self-incrimination and declined to review his answer. Then the trial court asked if Monterroso was amenable to a mutual restraining order. The inference is that the trial court decided that a mutual restraining order was an expedient way to protect or mollify Moran and resolve the matter without reaching the merits.

We write with an eye toward the role of the courts in our community. Though we do not know what actually transpired between Monterroso and Moran, we do know this: Domestic violence is a grievous problem in today's world, and its victims often have few places to turn. The courts must be sensitive to allegations of domestic violence, root out the truth in each case, and protect victims when possible. Victims should be guided through our judicial system, not herded.

In 1996, the Judicial Council of California Advisory Committee on Gender Bias in the Courts (the committee) issued a final report that found that "mutual restraining orders create difficult enforcement problems" because the police often do not know whom to arrest if there is a subsequent altercation and may end up arresting both parties or neither party. Moreover, "the committee received convincing testimony that victims of domestic violence who have not engaged in an act of violence are confused, humiliated, and degraded by orders restraining them from such conduct." Some witnesses "reported that mutual restraining orders give victims the message that they are being blamed." According to the committee, "[p]erhaps a potentially volatile courtroom situation is diffused somewhat by issuing orders against both parties, but respect for the law is undermined." (Judicial Council of Cal., Advisory Com. on Gender Bias in the Courts, Achieving Equal Justice for Women and Men in the California Courts, Final Report (July 1996) <http://www.courtinfo.ca.gov/programs/access/documents/f-report.pdf> [as of Jan. 11, 2006].)

Today we do little more than require that trial courts follow the letter of the law set forth in section 6305. In so doing, we exhort them to recognize that an improvidently issued mutual restraining order may adversely impact victims of domestic violence and continue their victimization.

## DISPOSITION

The order is reversed.

Upon remand, the trial court is directed to rule upon the merits of Monterroso's application for restraining orders against Moran.

Monterroso shall recover her costs on appeal.

Boren, P. J., and Doi Todd, J., concurred.