Filed 3/30/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re the Marriage of KYLE and VALERIE ANN EVERARD.<br><br>KYLE LINLEY EVERARD,<br><br>    Appellant,<br><br>    v.<br><br>VALERIE ANN EVERARD,<br><br>    Respondent. | D075110<br><br>(Super. Ct. No. 17FL014248E) |

APPEAL from an order of the Superior Court of San Diego County, Tilisha T. Martin, Judge.  Affirmed.

Law Office of Anthony J. Boucek and Anthony J. Boucek, for Appellant.

No appearance by Respondent.

Appellant Kyle Linley Everard (Kyle) appeals the order entered after a long-cause hearing in which the court granted reciprocal domestic violence restraining orders (sometimes, DVRO(s)) against Kyle and respondent spouse Valerie Ann Everard

(Valerie).[1]  In issuing the DVROs, the court pursuant to Family Code[2] section 6305 found both parties acted as primary aggressors and that neither party acted primarily in self-defense in multiple domestic violence incidents.

Kyle on appeal claims the court erred in including him in the DVROs based on its admission of an unauthenticated 2013 police report offered by Valerie, which report Kyle claims was allegedly the exclusive basis for the court's findings against him under section 6305.  Because we conclude substantial evidence in the record supports the court's findings independent of the 2013 police report, and because we further conclude the court's findings satisfied section 6305, we affirm the DVRO against Kyle.

FACTUAL AND PROCEDURAL OVERVIEW

*Request for Mutual DVROs*

Kyle and Valerie married in April 2007, and together had two children, twins N. and C. (born February 2009) (sometimes, minors).  They separated on December 14, 2017.  Kyle on December 19, 2017 filed a request for DVRO against Valerie based on

---

[1]     Valerie has not filed a respondent's brief.  This, however, does not absolve us of adjudicating the merits of Kyle's appeal.  (See *In re Bryce C.* (1995) 12 Cal.4th 226, 232–233 [noting that "[i]f an *appellant* fails to file a brief, the appeal may be dismissed entirely," but "if the respondent fails to file a brief, the judgment [or order] is not automatically reversed" as the "reviewing court 'may accept as true the statement of facts in the appellant's opening brief and, unless the appellant requests oral argument, may submit the case for decision on the record and on the appellant's opening brief' "]; see also *Votaw Precision Tool Co. v. Air Canada* (1976) 60 Cal.App.3d 52, 55 [noting that, although some courts treat the failure to file a respondent's brief as consent to reversal, the "better rule . . . is to examine the record on the basis of appellant's brief and to reverse only if prejudicial error is found"].)

[2]     Unless noted otherwise, all further statutory references are to the Family Code.

among others a December 17 domestic violence incident. Kyle in his request sought a personal conduct order for, and stay-away and move-out orders against, Valerie.

Kyle stated under penalty of perjury that before the December 17 incident, he had been temporarily staying at his mother's home because of the escalation of domestic violence by Valerie; that on December 17 during a "FaceTime" call with minors, they started screaming, "Mommy stop! Why mommy? What are you doing mommy? You're going to die, mommy, STOP STOP STOP"; and that C. stated Valerie had a "steak knife held to her own arm" and was "threatening to cut off the tattoo of [Kyle's] name." Kyle told C. he was calling police and was on the way to pick them up.

Once at the scene, Kyle found sheriff deputies already had "handled the situation," taking Valerie to her mother's home to "cool off," and recommending Valerie undergo a "mental evaluation." Kyle spoke with Sheriff Deputy Kyle Babcock, who ended up writing a report (sometimes, Babcock Report), and who also testified at the multiday hearing.

As noted, Kyle in his declaration stated there had been other incidents of domestic violence between him and Valerie, including on December 15, when Valerie became upset, verbally abusive, and, according to Kyle, started throwing items at him, hitting and injuring him; on December 1, when Valerie became angry in front of minors while they were driving to a holiday event because of Kyle's driving; and in early September, when Valerie kicked Kyle in the back of his thighs in front of N., threw a plate of food at Kyle, instead accidently hitting N., and picked up a "barbeque fork" and, while holding it to Kyle's chest, stated "she wished she could 'run it through [his] fucking heart.' "

3

On December 20, Valerie filed her own request for a DVRO. Similar to Kyle's request, Valerie sought a stay-away order, and requested she be allowed to live in the family home with minors. Valerie also sought legal and physical custody of minors; and requested Kyle have no visitation with them until the hearing, which was set for January 5, 2018.

In support of her request, Valerie claimed Kyle was the aggressor in domestic violence incidents. According to Valerie, on December 10 Kyle followed her around the family home, blocked her movements, and said she should "hit" him. Valerie stated this incident took place in front of minors.

In another incident, Kyle in August 2016 pushed Valerie onto the couch, "used his arm to choke [her] as he sat his entire body on [her]," and "twisted [her] arm behind [her] shoving [her] face into the couch." Valerie claimed minors also were present during this incident.

Valerie in her request for a DVRO also recounted another domestic violence incident from 2013. In this incident, while allegedly drunk Kyle yelled at her, pushed her around their bedroom, and then choked her with his hands. He next pushed her onto their bed, laid on top of her so that she could not move, and used his forearm again to choke her. San Diego County Sheriff Deputy Billy Tennison, III responded to the call, investigated, and, based on the "totality of the evidence," determined Kyle was the "dominate aggressor" in this incident. Deputy Tennison arrested Kyle, and the following day prepared a four-page report regarding this incident (sometimes, Tennison Report).

4

The record shows both parties filed amended requests for a DVRO. The parties then entered into a stipulation, which the court recognized in the unreported January 5 hearing, in which they agreed each would stay away from the other; Kyle would live in the family home and have legal and physical custody of minors; and Valerie would have supervised visitation with minors, including on some weekends. The court ordered the parties to attend separately Parent's Turn, minors to attend Kid's Turn, and set the cause for follow up hearing on August 22, 2018.

*Multiday Long-Cause Hearing*

In connection with the August 22 hearing, Kyle on August 20 filed a trial brief requesting the court to extend the DVRO against Valerie. In support of his request, Kyle argued Valerie had violated that restraining order almost immediately after it had been entered in January. These violations included Valerie sending Kyle "harassing and insulting text messages, approaching him within five (5) yards, arguing with him at C[.]'s dance classes, participating in C[.]'s dance activities without her agreed-upon supervisor, and informing the children that the restraining order [was Kyle's] fault and she [would] be parenting them alone soon."

Kyle's brief also addressed concerning behaviors by N., including an incident on July 24 when N. became angry after Kyle took away his tablet. N. responded he "hates his life and wishes he could die." (Emphasis omitted.) Kyle noted he arranged counseling for N.

Kyle in his August 20 trial brief also addressed what he claimed were Valerie's "numerous fabrications" in her previous request for a DVRO. He claimed he had "never

5

attacked nor threatened to harm [Valerie] at any time" (emphasis omitted), as she alleged; that he had only defended himself from being struck by her; and that he had only raised his voice at Valerie when "telling her to stop hitting him."

Finally, regarding the incident in July 2013 that was the subject of the Tennison Report, Kyle claimed that he and not Valerie called police when Valerie would not stop hitting and kicking him; and that the dispatcher informed him if it was a domestic violence incident, "someone [was] going to jail." Once officers arrived, Kyle claimed they took him outside and photographed his injuries. Because he did not want Valerie arrested, Kyle further claimed he omitted telling the officers about the domestic violence. However, after interviewing Valerie, officers "cuffed" Kyle and took him away for the night. According to Kyle, no charges were ever pursued as a result of this incident.

*Babcock Report*

Kyle also lodged the Babcock Report, portions of which have been redacted (ostensibly to protect the privacy of the parties). Deputy Babcock noted in his report that his investigation of the December 17 domestic violence incident commenced when he received a radio call requesting he contact Valerie because she needed help obtaining a temporary restraining order (TRO) against Kyle. Deputy Babcock further noted that, during their conversation, Valerie was crying and stated she was scared of Kyle. Deputy Babcock drove to the family residence and conducted an in-person interview with Valerie. Deputy Babcock activated his body worn camera and recorded the interview.

6

Valerie told Deputy Babcock that she and Kyle "regularly argue over 'stupid stuff' "; that when she attempts to speak to Kyle about "issues he becomes highly 'defensive' "; that they have "very little time to work on their issues because Kyle 'works all the time' "; and that, over the years, there had been "multiple instances of unreported domestic violence" between them.

Deputy Babcock in his report noted that a few months earlier, Valerie admitted "slapp[ing]" Kyle "in the face"; that this incident went unreported; that since this incident, Valerie found "their relationship ha[d] deteriorated further"; that Valerie believed Kyle was "attempting to lure her into a situation where she [would] strike him again and cause her to be arrested"; that Kyle did so during arguments by "puff[ing] his chest, stand[ing] close to her and block[ing] her movements through the house"; and that Valerie found Kyle "unpredictable" when he drank alcohol, which, according to her, was often.

Deputy Babcock in his report noted he then went back to the station and called Kyle. Deputy Babcock's report summarized their conversation as follows: "Kyle told me that his relationship with Valerie has deteriorated in the last eight years. Kyle informed me there have been multiple incidents of unreported domestic violence between the two. Kyle told me following the incident when Valerie slapped him[,] he has since hired an attorney and is in the process to file for divorce. Kyle is also in the process of obtaining a TRO.

"Kyle spoke of one incident where Valerie stood in the kitchen during an argument holding a large fork and stated[,] 'I wish I could run this through your heart

7

mother fucker.' Kyle told me he fears for his safety in the house and as a result, he has been staying with his mother in El Cajon." Deputy Babcock concluded his report by noting he had made a "cross report" for child protective services (CPS) and sent it to the agency via the "email hotline."

In preparation for the August 22 hearing, Valerie sought to lodge among other documents the (four-page July 23, 2013) Tennison Report. Kyle in response objected to the Tennison Report's admission on myriad grounds including lack of authentication, foundation, and hearsay. As noted *ante*, the court overruled Kyle's objections and found the Report admissible under the business records exception to the hearsay rule. (See Evid. Code, § 1280.[3]) The court also found that, to the extent there were any statements of a party opponent in the Report, then such statements also would come in as an exception to the hearsay rule. (See *id*., at § 1220.[4])

*Witness Testimony*

The record shows Kyle, Valerie, and Officer Babcock testified at the multiday hearing. Summarizing that testimony, Kyle told the court that Valerie began suffering

---

[3]     Evidence Code section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

[4]     Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he [or she] is a party in either his [or her] individual or representative capacity, regardless of whether the statement was made in his [or her] individual or representative capacity."

8

"mental health issues" after giving birth to the twins, which included "extreme bouts of anger from nowhere." Kyle recalled various instances of unreported physical abuse by Valerie, including in 2010 when she struck him in the face, giving him a black eye; and in June and again in July 2013.

Regarding the July 2013 incident that is the subject of the Tennison Report, Kyle stated he and Valerie had been drinking "regularly" with neighbors during this time frame. On the night of the incident, Valerie became angry because Kyle had two "mixed drinks." The confrontation turned violent when Kyle, after asking Valerie if she was "going to hit [him] again," was in fact struck by Valerie. Kyle further stated that he called 911 and was told by dispatch that, if it was a domestic violence incident, someone was going to jail. Because Kyle did not want Valerie incarcerated, he chose not to tell police how he sustained his various injuries.

Kyle stated Valerie also struck him in 2016. He denied any domestic violence against Valerie in August 2016, despite what she stated in her own request for DVRO. Kyle instead claimed Valerie "attacked" him and he in response "grab[bed] her arms to stop her until she [was] able to calm down and regain control of her emotions." Kyle denied ever striking Valerie, and noted he stayed in the family home to protect minors.

Kyle also testified to other more recent incidents of unreported domestic violence, as provided in his request for DVRO, including in September 2017 when Valerie admitted "lash[ing] out" at Kyle; and in the November and December 2017 timeframe, when Valerie became verbally abusive, including at times in the presence of minors.

9

During this same timeframe, Valerie told minors her marriage to Kyle was over while Kyle was on a business trip.

Kyle denied ever "blocking" Valerie, following her around the family home, or otherwise restricting her movements, as Valerie also claimed in her request for DVRO against Kyle. Kyle also testified about the December 17 incident when minors reported during a telephone conversation with Kyle that Valerie had put a kitchen knife to her arm. Kyle testified he obtained a restraining order the next day because Valerie was unable to control her emotions, including in front of minors. Kyle also testified Valerie violated the DVRO shortly after it issued and continued to do so up until the multiday hearing.

Deputy Babcock's testimony corroborated the information in his report concerning the December 17 incident.[5] Briefly, Deputy Babcock noted that Valerie was "highly agitated" and "crying" when he spoke to her on the phone; that she then admitted there had been "unreported domestic violence in the ho[me] in the past" and she feared for her safety; that Deputy Babcock found Valerie credible, as she also complained that Kyle often drank alcohol and sometimes to excess; that she wanted help in filing a restraining order against Kyle; and that he also spoke to Kyle that same day who mentioned the incident when Valerie slapped him, and also the "fork" incident, when Valerie told Kyle she wanted to use it to run it " 'through [his] heart, mother fucker.' "

---

[5]     The record shows at one point during the hearing, Kyle's counsel mistakenly referenced the domestic violence incident that was the subject of the Babcock Report as taking place on September 27, 2017. However, the Babcock Report and the witnesses' testimony unambiguously show the incident occurred on December 17.

Valerie also testified at the long-cause hearing. She stated that Kyle often attempted to "intimidate" her by getting in her "face," yelling at her, and calling her names such as "bitch"; that Kyle followed her around the family home and "block[ed]" her movements; and that he put her in a position where she felt the need to "defend" herself because she was fearful of him, thus leading to incidents of domestic violence. Valerie claimed toward the end of their relationship, Kyle engaged in such behaviors about "every other week."

Regarding December 17, Valerie's testimony sharply conflicted with Kyle's concerning this domestic violence incident. Valerie testified they went to dinner, which did not "go well"; that Kyle had been "drinking" when an argument ensued; and that Kyle once again followed her around the family home, blocking her movements, and yelling at her. Once in the hallway when she no longer could get away, Kyle asked Valerie, "What you are going to do?" to which she responded, "You are going to move out of the way" as she used her arm and pushed him aside.

Valerie admitted to slapping Kyle "once" in September 2017. According to Valerie, on this occasion Kyle was about three or four inches from her face, saying "horrible" things about her in front of minors. Afraid because Kyle had "thrown [her] down several times," had "battered" her, and had been "aggressiv[e]" towards her in the past, Valerie slapped Kyle in order to get him away from her. Valerie also denied ever using a fork to threaten Kyle.

Regarding Kyle's consumption of alcohol, Valerie claimed he used "McDonald's cups" to "hide" his drinking, which she claimed he would "deny and deny and deny."

11

Valerie also claimed Kyle "bing[ed]" when he drank alcohol, stating sometimes he drank for "days on end," which led to a change in his behavior. When asked to describe that change, Valerie stated Kyle became a "bully" and "didn't understand what [was] right or wrong." Valerie discussed other incidents when Kyle was drunk, including in front of minors and one time when driving minors to an event.

Regarding the December 17 incident when Kyle was on the telephone with minors, during that call Valerie heard Kyle tell them the following: "Mommy and daddy are going to get a divorce. Don't worry it will be okay. We will probably meet other people, and they might have other children, and then you will have stepsisters and stepbrothers." Valerie also heard Kyle tell minors that "their friend, Holly, [was] going through a divorce so they probably [could] understand that, you know, everything [would] be okay because she was going through it."

Because Kyle had been gone on a business trip for about a week and would not talk to her, Valerie testified she became "extremely upset" at Kyle after hearing him say these things to minors. Thus, while doing the dishes, Valerie grabbed what she described as a "butter knife" and merely "waved" it across her arm where Kyle's name was tattooed. Valerie denied touching her arm with the knife or threatening to cut herself.

Valerie also testified about the August 2016 incident that she referenced in her request for a DVRO. Valerie testified she, Kyle and minors attended a pool party on that day. At some point, Valerie left with some girlfriends to see a movie, while Kyle stayed behind with minors at the party. Valerie estimated minors were then about seven years old. When Valerie returned, Kyle was drinking alcohol from his McDonald's cup and

12

talking to a woman who, according to Valerie, had just had breast-augmentation surgery. Valerie confronted Kyle, who was slurring his words and making inappropriate comments to the woman about her breasts, which Valerie found embarrassing.

Once home, Valerie confronted Kyle over his behavior at the party, including what she believed was his failure to supervise minors. Kyle denied being drunk and claimed other men were making similar comments to those he made to the woman. Valerie testified when she got up from the couch, the following occurred: "I went around the coffee table this way, he jumped up, and he came around the coffee table this way, and I was trying to push him to get out of the way. I was like, 'Kyle, I am not going to do this.' He pushes me onto the couch. He shoves my face into the cushions. He has got my right arm behind my back. He puts all of his weight, and I'm screaming, 'Kyle, get off me, get off me, get off me.' And he is screaming. I don't know what he was saying. But I remember reaching my hand around and I'm scratching at him, I'm punching, I'm kicking, my face is into the cushion, I can't breathe . . . ."

On further questioning, Valerie clarified that Kyle had his "left arm over [her] neck," while her "face was in the sofa"; that Kyle had "his knees on [her] back and butt," preventing her from moving; that she was "afraid" of Kyle because he was "heavy and scary" and "much stronger" than her; and that she estimated Kyle held her against her will for "[a]t least a minute," although it "seem[ed] like forever." Like Kyle, Valerie also testified to other incidents of unreported domestic violence, including when Kyle would become verbally abusive toward her in front of minors.

13

Finally, regarding the July 2013 incident when Kyle was arrested, Valerie's version of events was much different than those testified to by Kyle. According to Valerie, they began to argue after she put the children to bed and confronted him about his drinking alcohol. Valerie recalled Kyle was slurring his words, "not making sense," and "becoming combative." Valerie in response went to the kitchen and "poured his whiskey out into the sink," causing Kyle to get "very mad." Kyle followed Valerie upstairs, and continued yelling at her, at one point putting "his finger in [her] face." Feeling "threatened" by Kyle, who also was "blocking" her, Valerie told Kyle to "shut up," "back off," and pushed his finger out of her face.

Valerie testified Kyle in response grabbed her hand, "shoved it behind [her] back, and . . . pushed [her] onto the bed." Kyle then "climbed on top of [her] . . . and had his arm around [her] neck." Kyle then proceeded to "chok[e]" her, as Valerie could not breathe and was "very, very, scared." Valerie was concerned Kyle might kill her, as she struggled to breathe. Worried for minors, and her own life, Valerie testified she fought back, including "hitting," "scratching" and "punching" Kyle to get him off her.

At some point, Kyle jumped off Valerie, said he was calling the police, and claimed she and not him would be arrested based on all the "bruises and marks on [his] face." While Kyle was on the phone with 911 dispatch, Valerie grabbed the phone from him and told the operator she had just been "attacked" by Kyle and was "going to be outside." Valerie stated she left the home because she was "terrified" of Kyle after what had just happened, and did not return until the police arrived.

14

*Court's Ruling*

The court at the conclusion of the multiday hearing ruled in part as follows: "This Court finds that each party in this case has submitted sufficient evidence for this court to grant mutual restraining orders pursuant to [section] 6305. As both parties have met the burden by a preponderance of the evidence pursuant to Evidence Code [section] 115, that domestic violence has occurred as defined by the Domestic Violence Prevention Act. Both parties acted—have acted in this court's findings as primary aggressors at different times during the many verbal and physical altercations that were testified to by each of the parties in this Court. The Court finds that the domestic violence in this relationship has been prevalent throughout the martial relationship and that neither party necessarily acted primarily in self-defense.[6] The Court does not find either party credible, that each acted primarily in self-defense, as the evidence before the Court does not support that position."

The court continued that it found Valerie's testimony "credible in her description of the physical altercations that occurred between her and the petitioner, Mr. Everard, based on her demeanor during her testimony. As Ms. Everard testified to this Court, this Court observed her to become emotional at times, her speech became rapid as she attempted to describe the incidents that occurred between her and Mr. Everard, and, in

---

6    We note Kyle on appeal does not specifically challenge the court's finding he committed domestic violence against Valerie within the meaning of the DVPA.

15

addition, she used a lot of nonverbal cues to try to demonstrate what was occurring during the altercations between her and Mr. Everard."

The court next found Valerie's fear of Kyle's "unpredictable behavior towards her" was "*corroborated* by *two* different police officer reports." (Italics added.) The court noted Valerie's testimony, summarized *post*, was consistent with certain details of the Tennison Report regarding the 2013 domestic violence incident leading to Kyle's arrest, and Kyle's behavior in general.

Specifically, the court recognized Valerie's testimony in which she stated that when Kyle "drinks he becomes violent." The court also recognized that Kyle himself testified that, with respect to the July 2013 incident, he "had two mixed drinks, diet Coke and a shot-and-a-half of whiskey. This admission is consistent with Ms. Everard's testimony that Mr. Everard drinks alcohol throughout the day, camouflag[ing] them in a McDonald's cup."

As noted, the court also relied on the Babcock Report and Deputy Babcock's testimony, which Kyle has not challenged on appeal, to support its findings. As further noted, the court found such evidence *corroborated* Valerie's testimony that she was "fearful of Mr. Everard and that he provokes her. This statement of Officer Babcock in his 2017 report is consistent with Ms. Everard's testimony that when they argue Mr. Everard often follows her, he calls her names, and he asked her in the midst of the argument if she [was] going to hit him, which he also testified to making this comment in his testimony before the Court, as well as wrote it in his declaration that he provided with his request for a restraining order."

The court continued, "What this Court found compelling about Officer Babcock's report is that both parties admitted to multiple acts of unreported domestic violence situations within the home. And According to Officer Babcock's impressions of Ms. Everard when he met with her, he observed her voice to be trembling, she was upset, and she stated she feared for her safety, and he believed her. Although he qualified at times when she was describing her relationship with petitioner, he believed her. Officer Babcock's testimony before this Court is that he took Ms. Everard's demeanor to be considered as fearful of Mr. Everard."

The court expressed concern that the incidents of unreported domestic violence were increasing in number and severity, warning the parties as follows: "Pursuant to [section] 6220, the purpose of the [DVPA] is to prevent domestic violence and provide for separation of the parties for a period sufficient to enable the parties to seek a resolution for the causes of this violence. It is clear to this Court that the breakup of this family unit is one that is very contentious and fraught with high conflict. This breakup has culminated in name[-]calling, physical altercations, negative conduct that if not addressed could lead to these parties being incarcerated and their children placed in foster care."

The record shows the court found that the parties had already been the subject of two reports to CPS; and that it was "concerned about the health, safety and welfare of these two children in each of these parents' care, because what this court has before it is a situation where Mr. Everard appears to drink to excess at times and Ms. Everard is unable to control her anger impulses at times. Each party accuses the other of being an

17

inappropriate caregiver for the children. And given that both parties are restrained parties on this mutual restraining order that this Court is going to grant today to ensure that these children are no longer exposed to the conflict between their parents, both of these parties are put in a position to have to show this Court that it would not be detrimental and in the best interest of the children to be in their primary care under [section] 3044.

"This Court is going to order that both parties participate in family court services mediation to assist this Court with obtaining an objective neutral view of an appropriate parenting plan that would be best for these children.

"This Court also finds under [section] 3150 that it is in the best interest of these children to appoint minors' counsel to assist this Court that these children are going to be safe in the care of either parent. This Court finds that the high conflict between these parties, the allegations of alcohol abuse, the allegation of anger management and mental health issues, the young ages of these children and the existence of the mutual restraining orders is an appropriate reason for minors' counsel to be appointed to this case in the best interest of the children."

The record shows the court went on to make other findings[7] and interim orders including custody of minors, visitation, and time over the holidays among other subject matters that are not at issue in this appeal.

---

7    Although Valerie did not appeal the DVRO against her, we note the court also found that she inflicted physical injuries on Kyle, which constituted domestic violence under the DVPA.

18

DISCUSSION

A. *Guiding Principles*

Pursuant to the Domestic Violence Prevention Act (DVPA) (§ 6200 et seq.), a court may issue a protective order " 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782; accord, § 6300 [providing in part, "(a) An order may be issued under this part to restrain any person for the purpose specified in Section 6220, if an affidavit or testimony and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse"].)

As relevant here, the DVPA defines domestic violence as abuse perpetrated against a spouse or the child of a party. (§ 6211, subds. (a) & (e).) Abuse includes "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another" or "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a)(3) & (4).) Enjoined conduct includes molesting, striking, stalking, threatening, or harassing. (§ 6320, subd. (a).) The DVPA requires a showing of past abuse by a preponderance of the evidence. (*Cooper v. Bettinger* (2015) 242 Cal.App.4th 77, 90, fn. 14; *Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.)

At issue here is section 6305, which provides: "(a) The court shall not issue a mutual order enjoining the parties from specific acts of abuse described in Section 6320

19

unless both of the following apply: [¶] (1) Both parties personally appear and each party presents written evidence of abuse or domestic violence in an application for relief using a mandatory Judicial Council restraining order application form.  For purposes of this paragraph, written evidence of abuse or domestic violence in a responsive pleading does not satisfy the party's obligation to present written evidence of abuse or domestic violence.  By July 1, 2016, the Judicial Council shall modify forms as necessary to provide notice of this information. [¶] (2) The court makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense. [¶] (b) For purposes of subdivision (a), in determining if both parties acted primarily as aggressors, the court shall consider the provisions concerning dominant aggressors set forth in paragraph (3) of subdivision (c) of Section 836 of the Penal Code."

Penal Code section 836, subdivision (c)(3) in turn provides: "In situations where mutual protective orders have been issued under Division 10 (commencing with Section 6200) of the Family Code, liability for arrest under this subdivision applies only to those persons who are reasonably believed to have been the dominant aggressor.  In those situations, prior to making an arrest under this subdivision, the peace officer shall make reasonable efforts to identify, and may arrest, the dominant aggressor involved in the incident.  The dominant aggressor is the person determined to be the most significant, rather than the first, aggressor.  In identifying the dominant aggressor, an officer shall consider (A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence

20

between the persons involved, and (D) whether either person involved acted in self-defense."

We review the grant or denial of a request for a DVRO for abuse of discretion. (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1426–1427.) " 'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.' " (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780; accord, *In re Marriage of Evilsizor & Sweeney*, at p. 1424.) " 'However, "[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the ' "legal principles governing the subject of [the] action . . . ." ' " ' " (*J.J. v. M.F.* (2014) 223 Cal.App.4th 968, 975; accord, *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264–1265.)

C. *Analysis*

Although Kyle argues the court "exclusively" relied on that Tennison Report in making its findings against Kyle under section 6305, the record actually shows the court also relied on the Babcock Report, portions of Kyle's testimony, Valerie's testimony, and the parties' requests for DVROs, as modified, to support its findings in this case.

Kyle next argues the court did not make the required "detailed findings of fact" as to him to show he also acted as a "primary aggressor" in any of the incidents of domestic violence (excluding the July 2013 incident that was the subject of the Tennison Report). (See § 6305, subd. (a)(2).) We disagree.

21

We have found very little if any caselaw defining what findings a trial court must make to satisfy the "detailed findings of fact" requirement in subdivision (a)(2) of section 6305. At a minimum, to satisfy this requirement and provide for the issuance of mutual protective orders under this statute there must be evidence and a finding of abuse by both parties. (See § 6305; *Monterroso v. Moran* (2006) 135 Cal.App.4th 732, 736 (*Moran*) [noting a "trial court has no statutory power to issue a mutual order enjoining parties from specific acts of abuse described in section 6320 without the required findings of fact"].)

The *reason* for this statutory requirement was discussed by the court in *Moran*. There, the Court of Appeal concluded the trial court acted in excess of its jurisdiction by entering mutual restraining orders without first making the required findings of fact as provided under section 6305. (*Moran*, *supra*, 135 Cal.App.4th at p. 734.) The plaintiff in *Moran* sought a restraining order against her husband. On the day of the hearing, the plaintiff appeared in propria persona, while the defendant husband was represented by counsel. Both parties were assisted by a Spanish-language interpreter. When the trial court asked if the matter could be resolved by the parties, counsel for the defendant stated the parties agreed to make the "restraining orders mutual" (*id.* at 735), despite the fact the defendant had not sought such relief. On questioning by the court, the plaintiff agreed to mutual restraining orders. Without making any findings of fact, the court in *Moran* altered the plaintiff's proposed restraining order and each party signed it. (*Id.* at 736.)

After finding the language of section 6305 was "clear" and the trial court acted in excess of its jurisdiction by issuing mutual restraining orders without the required findings (*Moran*, *supra*, 135 Cal.App.4th at p. 736), the court then turned to the issue of

22

whether the plaintiff could challenge the order restraining her after agreeing to be bound by it. In finding the plaintiff was not estopped to challenge the order, the *Moran* court cogently ruled as follows: "We note that [the plaintiff] Monterroso cleans houses for a living. She appeared at the hearing without representation and needed a Spanish-language interpreter. She did not display any legal sophistication. Though the trial court asked if she was amenable to a mutual restraining order, the trial court did not ask her if she understood that a mutual restraining order required a detailed finding that both parties acted primarily as aggressors and not primarily in self-defense during a prior incident. Nor did the trial court ask her to stipulate to such facts. Because the trial court did not fully explain the import of a mutual restraining order, there is no indication that Monterroso could appreciate all of its ramifications. Under these circumstances, it cannot be said that Monterroso consented to the mutual restraining order such that she is estopped from seeking redress on appeal.

"As the court in *Conness v. Satram* (2004) 122 Cal.App.4th 197 pointed out, the original version of section 6305 required the parties to present written evidence unless they agreed that the requirement did not apply. But then the '1995 amendment eliminated the waiver provision and added a requirement that the court make detailed factual findings supporting the conclusion that both parties acted primarily as aggressors and neither acted primarily in self-defense. (Stats. 1995, ch. 246, § 2, p. 852.) This amendment helps ensure that a mutual order is the product of the careful evaluation of a thorough record and not simply the result of the moving party yielding to the other party's

23

importunities or the court deciding that a mutual order is an expedient response to joint claims of abuse.'  (*Conness v. Satram, supra,* at p. 204.)

"This quote has particular resonance.  Monterroso was never informed that she had every right to insist that the trial court rule on the merits of her application for restraining orders against [the defendant] Moran.  At the hearing, it was Moran's counsel who brought up the idea of a mutual restraining order.  The trial court did not inquire about the allegations of terrible domestic violence in Monterroso's application.  Instead, it expressed concern over protecting Moran's constitutional right against self-incrimination and declined to review his answer.  Then the trial court asked if Monterroso was amenable to a mutual restraining order.  The inference is that the trial court decided that a mutual restraining order was an expedient way to protect or mollify Moran and resolve the matter without reaching the merits.

"We write with an eye toward the role of the courts in our community.  Though we do not know what actually transpired between Monterroso and Moran, we do know this: Domestic violence is a grievous problem in today's world, and its victims often have few places to turn.  The courts must be sensitive to allegations of domestic violence, root out the truth in each case, and protect victims when possible.  Victims should be guided through our judicial system, not herded.

"In 1996, the Judicial Council of California Advisory Committee on Gender Bias in the Courts (the committee) issued a final report that found that 'mutual restraining orders create difficult enforcement problems' because the police often do not know whom to arrest if there is a subsequent altercation and may end up arresting both parties or

24

neither party.  Moreover, 'the committee received convincing testimony that victims of domestic violence who have *not* engaged in an act of violence are confused, humiliated, and degraded by orders restraining them from such conduct.'  [Italics added.]  Some witnesses 'reported that mutual restraining orders give victims the message that they are being blamed.'  According to the committee, '[p]erhaps a potentially volatile courtroom situation is diffused somewhat by issuing orders against both parties, but respect for the law is undermined.'  (Judicial Council of Cal., Advisory Com. on Gender Bias in the cts., Achieving Equal Justice for Women and Men in the California Courts, Final Report (July 1996) < http://www.courtinfo.ca.gov/programs/ access/documents/f- report.pdf> [as of Jan. 11, 2006].)

"Today we do little more than require that trial courts follow the letter of the law set forth in section 6305.  In so doing, we exhort them to recognize that an improvidently issued mutual restraining order may adversely impact victims of domestic violence and continue their victimization."  (*Moran*, *supra*, 135 Cal.App.4th at pp. 737–738.)

We find *Moran* provides meaningful guidance on the issue before us.  Unlike the situation in *Moran* where the unrepresented plaintiff merely agreed to the mutual restraining orders without *any* factual findings by the court, and without it reaching the merits of her application alleging "terrible domestic violence," the instant case involved a multiday long-cause hearing involving the testimony of the parties and Officer Babcock.

Indeed, as summarized *ante*, Valerie testified to multiple acts of domestic violence by Kyle, including in August 2016 and in September 2017, when, on both occasions, after consuming alcohol, he used his size and weight to hold Valerie against her will and

choke her with his hands and/or forearm, making it difficult for Valerie to breathe. In the August 2016 incident, Valerie testified she believed during that incident that she could die. Such record evidence more than supports the finding that Kyle acted as a "primary aggressor" in both incidents. (See § 6305, subds. (a)(2) & (b); *In re Marriage of G.*, *supra*, 11 Cal.App.5th at p. 780 [applying substantial evidence standard of review to a court's factual findings].)

Moreover, Officer Babcock testified he found Valerie credible when he spoke to her on the telephone on or about December 18, 2017, when she stated she was fearful of Kyle, *and* when he met with her in person later that same day and expressed the same concern. The court likewise found Valerie credible when she described the acts of domestic violence committed by Kyle, as summarized *ante*. It is axiomatic that appellate courts "do not reweigh evidence or reassess the credibility of witnesses. [Citation.]" (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.) Put another way, "[t]he Court of Appeal is not a second trier of fact. . . ." (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021.)

In addition, the record shows the court considered the instant case to be "very contentious and fraught with high conflict." The court found domestic violence had been prevalent throughout Valerie and Kyle's marriage, also noting the parties twice had been reported to CPS as a result thereof. The court was so concerned about the parties' behavior in this case that it appointed minors' counsel to assist the court in ensuring minors were safe in the care of either parent.

26

Like the trial court in the instant case, we too are concerned by the domestic violence in this family, given the history of "alcohol abuse," the "anger management and mental health issues" prevalent in the parties' relationship, and the minors' young age. As the *Moran* court noted, domestic violence is a "grievous problem in today's world." (*Moran*, *supra*, 135 Cal.App.4th at p. 738.)

In light of the important public policy underlying the DVPA and the need to protect victims of domestic violence, and in light of the record evidence in this case showing both parties engaged in repeated acts of domestic violence against the other, we decline Kyle's invitation to reverse the DVRO against him merely because he claims the court's findings were not detailed enough, when (1) there is more than sufficient record evidence to support the findings on which the court's order was based; and (2) the record shows the court conducted a " 'careful evaluation' " of the evidence before finding mutual restraining orders were warranted in this case. (See *Moran*, *supra*, 135 Cal.App.4th at p. 737.)

Although there is a dearth of authority on what constitutes "detailed findings of fact" under subdivision (a)(2) of section 6305, we note in other contexts the concept of detailed findings has been understood to require sufficient factual findings or analysis for a reviewing court to assess the factual or legal basis for the trial court's decision. (See e.g., *LeVesque v. Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 633–634 [noting under Labor Code statute that requires decisions to "state in detail the evidence relied upon and the reasons for its decision," the statement must provide adequate factual and legal guidance to allow the court to perform adequately its "responsibility of review"

27

under the statute]; *California Aviation Council v. City of Ceres* (1992) 9 Cal.App.4th 1384, 1388, 1392 [reversing judgment because city council failed to make "specific findings" as required under former section 21676, subdivision (b) of the Public Utilities Code, which at a minimum required the agency to "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order," and because it failed to make such findings, neither the trial court nor reviewing court could determine what standard of review to apply], quoting *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515; *Maggart v. State Bar* (1946) 29 Cal.2d 439, 442 [rejecting petitioner's contention that the Board of Governors should have based its recommendation upon more detailed findings of fact, noting "[i]t is sufficient if such findings enable this court to make an intelligent and fair review of the decision of the board"]; compare, *Moran*, *supra*, 135 Cal.App.4th at pp. 734–736 [finding a party cannot be bound to a mutual restraining order under section 6305 without *any* of the required statutory findings]; *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525 [recognizing that a "trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts," and as such, a "trial court is not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence"].)

Quite simply, the court's findings in the instant case are more than sufficient to allow this court to perform its responsibility to review the factual and legal basis of the DVRO issued against Kyle, thus satisfying the requirements of section 6305, subdivision

(a)(2). On this record, we conclude the court properly exercised its discretion in finding Kyle also subject to the DVROs. (See *In re Marriage of Evilsizor & Sweeney*, *supra*, 237 Cal.App.4th at pp. 1426–1427 [reviewing the grant or denial of a DVRO for abuse of discretion].)

DISPOSITION

The DVRO issued against Kyle under section 6305 is affirmed.


BENKE, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.