Filed 12/23/24  Storn v. Carney CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RON STORN,<br><br>        Defendant and Appellant,<br><br>        v.<br><br>DEBRA WADE CARNEY,<br><br>        Plaintiff and Respondent. | A169723, A169727<br><br>(Marin County<br>Super. Ct. Nos.<br>FL0000385, FL0000433) |

In November 2019, Appellant Ron Storn and Respondent Debra Wade Carney became engaged to be married.  Shortly thereafter, they purchased three pieces of artwork for $350,000 from a gallery that issued certificates of ownership listing both their names.  And in December they moved into a home in Tiburon, where they lived—not always harmoniously—until October 9, 2023, when Storn handed Carney a demand to leave within 30 days.  She moved out on October 24, taking with her personal items, some furniture, their two dogs—and two of the three pieces of artwork.

Within the next few days, Storn filed a police report, made an insurance claim for the artwork, and filed a civil complaint

1

regarding the artwork. And on October 29, Storn's attorney sent an e-mail to Carney—and not incidentally, three others—entitled "Representing Ron Storn: Grand Larceny/Civil Charges and Civil Complaint."

On November 1, Carney filed a request for a domestic violence restraining order against Storn. Fourteen days later, Storn filed his own request, and the two matters came on for hearing later that month. Following some 4.5 hours of testimony (heard over two days), the court orally announced its decision, and that same day issued one-year restraining orders for each party against the other, and also ordered Carney to return the artwork to the possession of Storn, but that he pay her $200,000.

Storn appealed. Carney did not. Storn's appeal makes five arguments, one of which is that the court exceeded its jurisdiction in issuing mutual restraining orders that did not comply with Family Code section 6305. We conclude this contention has merit, and we reverse.

## BACKGROUND

### The General Setting

On November 14, 2019 Storn and Carney became engaged to be married. He was 50 years old; she was 46. Both had been married; both had children.

Shortly after becoming engaged they bought three pieces of artwork from a gallery in New York. The price of the artwork was $350,000, of which Storn paid $335,000, Carney $15,000. A year or so after the purchase, the gallery issued certificates of ownership listing both Storn and Carney as owners. Carney

2

testified that the artwork was a gift to her, and presented a late-in-the-game (October 2023) letter from a former gallery worker to that effect, which letter was admitted into evidence.

In December, Storn and Carney (and her children) moved into a home on Monterey Drive in Tiburon. Storn testified that the home was his, that he paid the down payment, the mortgage, and the property tax.[1]

Carney testified that in the home Storn's behavior started to change, that he would act aggressively toward her, demean her, and yell at her. More specifically, she testified Storn would become upset if he felt unappreciated or if she questioned him about his lying, cheating, or gambling. Elaborating on the "yelling," Carney testified that Storn "comes very close" to her face, "it's terrifying", that he "gets, like, about an inch away and he screams to where I am terrified. . . his eyes bulge, his mouth clenches, it almost feels like he's going to hurt me." Such incidents, Carney said, occurred "throughout [the] relationship."

Patricia Wade, Carney's mother, testified about Storn's conduct, saying that when she was first told by Carney that Storn yelled at her, Wade thought, "everyone yells when they're in an argument." But her opinion changed when she witnessed first hand Storn yelling at Carney, going on to describe a time at her house when he became upset and "lost total control," that "his body got rigid, and he stomped over to her. And he was, like, right up into her face, screaming at the top of his lungs, just all

---

[1] Carney testified that it was "his house, but we bought it together."

taut, like, I thought he was going to hit her."  Wade also testified that after Storn demanded that Carney vacate the home, she would hear him screaming as she talked to her daughter on the phone.  This caused Wade to fear for her daughter's safety, and she traveled from her home in Florida to California to help her daughter escape Storn's abuse.

Turning to Storn's case, he testified in some detail about one specific act, in September 2023, which occurred while the couple was driving on the Richmond-San Rafael bridge towards Berkeley.  During the drive, Carney "brought up more about cheating and accusing [Storn] of certain things."  And, in Storn's words, "we had been talking for a while about separating and not being together.  And I just said 'This is it.  We're just done.'  And she got very upset, screaming."

"She took my phone and through [*sic*] it on the ground and said that she's going to call my mom.  She called my mom and said a number of lies.  In particular, she said that I was very mean to my kids, and also did not treat her kids right. [¶]

"And I was very upset.  And she was screaming, and I said 'I know when you get drunk you act very flirtatious and slutty.'  And so when I said that she slapped me across my face and my lips.  And I said to her, 'if I did that to you, you would call the cops and put me in jail.'  And she said, 'Be a man.  Grow up.  It wasn't a big thing.' "

The slap, Storn would later testify, was with the back of Carney's hand, a hand that had a large engagement ring on it.[2]

Storn testified in general terms that Carney was "emotionally unstable" and "volatile," going on to say she would scream at him "[p]robably two or three times a month." He also testified that Carney "threatened to publish lies on the internet" and to "publicly disclos[e] private facts" about him, but admitting on cross-examination he had no knowledge she had done so.

Storn denied most of Carney's accusations, but did admit there were issues about his gambling, which he acknowledges he did, but claimed to have stopped. And while he admitted they

---

[2]     This testimony prompted the trial court to exclaim, "Oh, this case makes me so uncomfortable. This is just privilege and entitlement. Driving a Mercedes with a three-carat ring. Bought $400,000 worth of jewelry. She took $35,000 of furniture. What are we doing here?" Eight lines later, the court interjected: "Did she scar you with her big ring in your bucket seats. I don't mean to be demeaning, but I'm very frustrated with this case. Next question, please."

These comments, and various others, indicate that this particular trial court Judge is well advised to review the Code of Judicial Ethics, particularly Canon 3B(5), which provides as follows: "A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, engage in speech, gestures, or other conduct that would reasonably be perceived as (a) bias, prejudice, or harassment, including but not limited to bias, prejudice, or harassment based upon . . . marital status, socioeconomic status . . . or sexual harassment."

5

"would argue," he would "never get into her face, scream like this on any situation."[3]

Storn and Carney never married, indeed had never set a date. In fact, there was specific evidence from Storn that as early as May 2021, he told Carney he did not want to marry her. And Wade, Carney's mother, testified that she told her daughter that she should "better never marry" Storn. Regardless, they lived together in the Monterey Drive home until October 2023.

On October 9, Carney returned from a trip to be handed a notice, demanding that she leave the home within 30 days. That day, Carney said, Storn repeatedly screamed at her that the house belonged to him, that she needed to get out, and that he would call law enforcement if she did not.

According to Carney, after October 10, Storn's conduct continued to escalate, and caused Carney to fear he would hurt her. On October 16, she signed a lease for an apartment in another city, hired movers on October 19, and moved out on October 24, taking with her some personal possessions, some furniture, their two dogs, and two of the three pieces of artwork.

Storn immediately filed a police report for stolen property and also an insurance claim for the artwork, and, apparently on

---

[3] There was specific evidence about a card Storn sent for Valentine's Day, 2020, a card that began with these sentences: " 'I am so truly sorry for the betrayal, damage, and trauma I have caused you.' It was not my intention or action I am proud of. In fact, it makes me sick I have done this to the person I want to be my life partner[.']" Storn said the card referred to his gambling.

October 30, a civil complaint in Marin County Superior Court seeking a determination as to the ownership of the artwork. And particularly germane to the issues pertinent here, on October 29, an attorney representing Storn sent an email with a subject heading titled, "Representing Ron Storn: Grand Larceny/Civil Criminal Charges & Civil Complaint." The email threatened criminal prosecution for removing artwork. The email was sent not only to Carney, but also to her ex-husband, a friend, and her mother.

These proceedings followed.

**The Proceedings Below**

On November 1, representing herself, Carney filed on DV Form 100, in her handwriting, a request for a domestic violence restraining order against Storn, which form states it is pursuant to Family Code section 6200 et seq.[4] This was designated superior court case no. FL0000385.

On November 15, represented by counsel, Storn filed his own request for domestic violence restraining order against Carney. This is superior court case no. FL0000433.

The court scheduled both requests to be heard together, in the court's words, "both at the same time." And they were, beginning on the afternoon of November 27 when Carney and Storn, both represented by counsel, appeared. The court heard some two hours of testimony from Carney and Wade, and the day ended with counsel for Carney calling Storn under Evidence Code

---

[4]     All undesignated statutory references are to the Family Code.

7

section 776.  Following very brief examination, the matters were continued to the afternoon of December 7, on which day the court heard another 2+ hours of testimony from Storn and his mother Loretta Storn.

Following the presentation of evidence, counsel provided brief closing argument, argument that, even with interruptions from, and colloquy with, the court, produced a mere nine pages of reporter's transcript.

And when counsel indicated they were done, the court immediately—and we mean immediately—announced its decision.  That decision is set forth in over three pages in the reporter's transcript, and we quote it in its entirety:

"THE COURT:  Okay. Anything else?

"[COUNSEL FOR STORN]:  No.  That's it.

"THE COURT:  The court is authorized to issue restraining orders on a preponderance of the evidence standard.  That's it. It's 50 percent and a feather.  It's almost nothing.  It's our lowest standard in our legal justice system.  It's not like a criminal trial. That's reasonable doubt.  Pretty high standard.  It's just who is more credible; right?  That's all it is.  So, I've heard—I think the trajectory of this case is interesting.  First a civil lawsuit was filed to get the artwork back or to keep the artwork. And then—

"[COUNSEL FOR STORN]:  To get the artwork back. Not—

"THE COURT:  Then, soon after, there was a restraining order that was filed.  Could argue the restraining order was filed

in retaliation to this because restraining orders are kind of flimsy.  But the temporary restraining order was granted.

"And I heard testimony regarding that restraining order. After the restraining order was issued, a second restraining order was filed.  Could also argue that that restraining order was in retaliation to the first restraining order.  And I think that's probably what happened.  And, for that reason, it tips the scale in her favor.  There's also the argument about the screaming at her. I believe that happened.  Probably a little too aggressive.  That helps to tip the scale.

"So I'm going to grant her request.  It will be a one-year restraining order because I think, in addition to this conduct, you need space.  Regarding the temporary restraining order that I issued, it was a very weak request.  But because the AirTag was in the trunk of her car, and also there's an allegation of a slap, I issued that restraining order which is based on reasonable proof, which is almost less than a preponderance of the evidence.  So, it was issued.  And what I heard, when Ms. Carney was on the stand, is she exhibited really poor impulse control.  She did.  But she lacks impulse control.  [¶]  There's testimony about the dogs. She really lost control of herself and started screaming.  And then when she was screaming, the incident on the Richmond Bridge where she backhanded him, she testified about taking his phone, and she believed that he was somehow cheating on her.

"But she failed to see, in that whole line of testimony, what a danger she caused to people driving around her.

"Complete lack of insight into her conduct. And that pattern is repeated over and over again.

"I'm also going to grant your request for the restraining order, the one-year restraining order against her, because I don't know what she is going to do, but she lacks impulse control.

"What's interesting about the artwork is I have really four pieces of evidence that point to joint ownership of the artwork. I have the certificates that list both people on the artwork. I have the letter from Lily, which, maybe, but if I don't give it any weight there's enough there to say that the artwork was jointly purchased. It was sent to mom's house in Florida where it sat for a year, and then I think it was a gift. I think it was a gift to both, to her.

"But, on the other hand, she canceled the Ring cameras and took the artwork out of the house. That's a big problem. She could have left it there until they decided, and she should have taken only what belonged to her until they decided how to separate everything. But the parties were so hostile with each other that that didn't happen.

"Since she took the artwork, the insurance company didn't have a problem with it. They helped her hang the artwork on the wall which was a surprise to everyone, but that's what happened. So, the Court is authorized to distribute the property and here's what is going to happen.

"Property control is Request for Distribution of the property in both restraining orders. And paragraph 19 of both restraining orders allows the Court to distribute the property.

"Ma'am, you are to return both pieces of property in exchange for $200,000. You're going to pay her $200,000 to pay for her portion of the artwork that you gave her because there's consideration here.

"There's plenty of evidence to show that you both owned the property. So, if you want it back, it's going to cost you $200,000 to get it back. And that's my order. Because it was a gift. You keep all the furniture. You keep the ring, and also the dogs. You get the dogs. But you're going to get the artwork.

"I signed both restraining orders. Both parties are responsible for their attorney's fees and costs. Now, I could have awarded attorney's fees to either party. I'm not quite sure how much this has cost you all, probably approaching $40,000.

"You could take advantage of these orders and drop the civil case and not continue to pay fees, but these are enforceable orders. So if you're found to violate these orders, then you may be found in contempt while dealing with a civil matter, unless there's a mistake. Okay?"

There followed some discussion about a civil standby order for Carney to retrieve some property, and court was adjourned.

The court issued the two restraining orders that same day.[5]

Under case no. FL0000385, the court granted Carney a one-year domestic violence restraining order against Storn. Under

---

[5] From all indications, it appears that these orders, with many entries in the handwriting of the court, were prepared before the court heard all the evidence on behalf of Storn.

section 19, entitled "Control of Property", it stated, "Return art in exchange for $200,000. It was a gift. Keeps furniture $35,000. Keeps the ring. Art exchange by 12/17/23." And under section 22, it granted a property restraint order that prohibited Storn from the "transfer, borrow against, sell, hide, get rid of or destroy any property, including animals, except in the usual course of business or for necessities of life" and required Storn to notify the Court and Carney of any new or big expenses and explain them to the Court.

Under case no. FL0000433, the Court granted Storn's request for a domestic violence restraining order against Carney, also for one year. In relevant part, under section 19 entitled "Control of Property" the Court stated, "Return art in exchange for $200,000 . . . Art exchange by 12/17/23." Under section 22, it granted an identical property restraint as quoted above.[6]

---

[6] Storn argues that the "Property Restraint" was error. While we need not reach the argument in light of our disposition here, we note that such restraint was manifestly wrong.

To begin with, Storn did not even request a property restraint. Carney did, but it was in obvious disregard of the instructions in section 20 of the request, which states that such section is to be checked *only if you are married or a registered domestic partner.* She was neither. Indeed, the statutory basis for such a property restraint is section 6325, which states, "The court may issue an ex parte order restraining a married person from specified acts in relation to community, quasi-community, and separate property as provided in Section 2045." In short, section 6325 allows property restraint orders to be issued only against individuals who are married or registered domestic partners.

12

As to both cases, the Court denied both parties attorney fees and costs.

On December 8, 2023, Storn filed a notice of appeal of the restraining order in case no. FL0000385, and on December 11, a notice of appeal of the restraining order in case no. FL0000433, and we ordered the appeals consolidated. As noted, Carney has not appealed.

On December 28, Carney filed an ex parte application seeking to have Storn held in contempt for, among other things, failing to pay her $200,000 for the return of the artwork. On January 18, 2024, the Court ruled that no orders shall issue pending appeal.

## DISCUSSION

### The Restraining Orders Have Expired, But We Decide The Appeal Nevertheless

As noted, the domestic violence restraining orders were for one-year, expiring by their express terms on December 7, 2024. Storn's reply brief was not filed until late October, and on November 6, counsel requested oral argument, the effect of which was that the case could not be heard before the orders expired. In light of that, citing to *Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, we directed the parties to submit supplemental briefs on the issue of whether the appeal would be moot and thus subject to dismissal.

We have received those briefs, and note that Carney agrees that the appeal is moot and we need not decide it. Storn argues

13

that the appeal should be decided for two reasons: (1) the issues here could have an effect on pending litigations, and (2) having a domestic violence restraining order on his record could have adverse consequences. We disagree with the first assertion, but are persuaded by the second.[7]

One recognized principle is that an appeal from an expired restraining order is not moot if it could have collateral consequences in the future. (See, e.g., *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 209 [appeal in dependency proceeding not moot where expired restraining order against mother "could have consequences . . . in this and future court proceedings" against her]; *San Diego Police Dept v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 564.)

As to what these consequences could be, they could include being prohibited from possessing firearms (section 6304). As one court put it, there in the context of whether to renew a restraining order, the " 'burdens' on the restrained party can be very real. There often will be some social stigma attached while a person is subject to a protective order. Existing employers may frown on an employee who is subject to such an order and prospective employers almost surely will. Thus, the restrained party may lose out on a promotion or a job. The continued existence of such an order likewise may, fairly or unfairly,

---

[7] Along with Storn's supplemental brief, he filed two requests, for (1) Judicial Notice and (2) Additional evidence on appeal. We deny both requests.

14

interfere with the restrained party's social life." (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1291.)

If we were to hold the appeal is moot, it would mean that the restraining orders against Storn and Carney would remain on record, a result, we conclude, that is not the preferred resolution of the matter, not in light of the circumstances here. There are several reasons why.

First, as shown above (see footnote 5, *ante*) and below, the trial court erred in at least two ways, errors that would go unrecognized and unrectified—all, of course, to the possible detriment of Carney and Storn.

Second, as the court itself described, the restraining orders are "kind of flimsy."

Third, is the language of the Domestic Violence Prevention Act (the Act) itself. The purpose of the Act "is to prevent acts of domestic violence, abuse, and sexual violence . . . for a period sufficient to enable these persons to seek a resolution of the causes of violence." (§ 6220.) As amended in 2014, the Act provides that its purpose is "to prevent 'acts of domestic violence, abuse and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence.' " And section 6300, which provides the authority for issuance of restraining orders, incorporates the purposes of section 6220, stating, "An order may be issued under this part to restrain any person for the purpose specified in Section 6220 . . . ."

15

As we read the statutory scheme, there are two explicit statutory purposes enshrined directly in the Act, both referencing the future. Put otherwise, while past acts of abuse "may" form an adequate evidentiary basis on which to issue a domestic violence restraining order, the purpose of such an order is still entirely prospective: to "prevent acts of domestic violence [and] abuse" and in the future to "provide for a separation of the persons involved. . . ." (§ 6220.)[8]

One can read the trial court's three-page decision and not find anything that talks about the future. This is perhaps not surprising for, as best we surmise, except for the time(s) that Carney and Storn must be in each other's presence in connection with the ongoing civil case, we see no other factor that would cause there to be any future interaction between them—no children issues, no neighbor issues, no continuing relationship, no nothing—not to mention they live in different cities. In light of all this, we wonder if the restraining orders should have issued at all. In any event, they were error.

---

[8]     The referenced section 6320 provides in subdivision (a) that: "The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in section 528.5 of the Penal Code, falsely personating as described in, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance, or, disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family household members."

**The Mutual Restraining Orders Were Error**

The issuance of a mutual restraining order is governed by section 6305:

"(a) The court shall not issue a mutual order enjoining the parties from specific acts of abuse described in Section 6320 unless . . . . [¶] . . . [¶]

"(2) The court makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense.

"(b) For purposes of subdivision (a), in determining if both parties acted primarily as aggressors, the court shall consider the provisions concerning dominant aggressors set forth in paragraph (3) of subdivision (c) of Section 836 of the Penal Code."[9]

"Detailed findings of fact" under this statute "require sufficient factual findings or analysis for a reviewing court to assess the factual or legal basis for the trial court's decision." (*In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 122, 127.) If the court enters mutual restraining orders without making the required "detailed findings of fact," the court acts in excess of its jurisdiction and the order is voidable. (*Melissa G. v. Raymond M.*

---

[9] Penal Code section 836, subdivision (c)(3) provides as follows: "The dominant aggressor is the person determined to be the most significant, rather than the first, aggressor. In identifying the dominant aggressor, [the court] shall consider (A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence between the persons involved, and (D) whether either person involved acted in self-defense."

(2018) 27 Cal.App.5th 360 (*Melissa G.*); *Monterroso v. Moran* (2006) 135 Cal.App.4th 732, 737–739.)

Here, the trial court clearly entered a "mutual order" within the meaning of Family Code section 6305:  both Storn and Carney filed requests for restraining orders against each other; both matters were decided as part of one consolidated proceeding; and the orders enjoin both of them from conduct against each other.  (See *Melissa G.*, *supra,* 27 Cal.App.5th at p. 368 ["As used in section 6305, the phrase 'mutual order' may refer to a single order restraining two opposing parties . . . or two separate orders which together accomplish the same result as a single order."]; accord, *Salmon v. Salmon* (2022) 85 Cal.App.5th 1047, 1055.)

Despite the express language of section 6305, the trial court failed to make the required detailed findings of fact.

As quoted above, the trial court's factual finding to support the restraining order against Storn was as follows:  "Could also argue that that restraining order was in retaliation to the first restraining order.  And I think that's probably what happened.  And, for that reason, it tips the scale in her favor.  There's also the argument about the screaming at her.  I believe that happened.  Probably a little too aggressive.  That helps to tip the scale.  [¶]  So I'm going to grant her request."

To begin with, filing a request for a restraining order is not "abuse" within the meaning of section 6203 or section 6320.  And as to the observation about "screaming at her," the court's finding is not "detailed" in any sense of the word: it is totally unclear what event(s) the trial court is referring to, the court did not find

18

Storn was the "dominant aggressor" in any such incident(s), and did not make any finding as to whether Storn was acting in self-defense.

And as to Carney, the court essentially talked about impulse control. Section 6305 was just ignored.

**Storn is Not Entitled to Attorney Fees**

Storn's last argument is that the court "exceeded its jurisdiction" in not awarding him attorney fees, as in his view he was the prevailing party.[10] We easily reject the argument.

To begin with, Storn did not request attorney fees nor did he object when the trial court stated that it was not inclined to award attorney fees to either party. But even if he had, we fail to see how someone against whom a domestic violence restraining order was issued can claim to be a "prevailing party." As we said in *Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1158, the trial court is given wide discretion in determining whether a party has prevailed for purposes of awarding attorney fees. We see no abuse of discretion here.

## DISPOSTION

The restraining orders are reversed. Each side will bear its own costs on appeal.

---

[10] Section 6344, subdivision (a) provides that "[a]fter notice and a hearing, a court, upon request, shall issue an order for the payment of attorney's fees and costs for a prevailing petitioner."

19

_____

RICHMAN, J.

We concur.

_____

STEWART,  P.J.

_____

DESAUTELS, J.

(*Storn v. Carney A169723, A169727*)