Filed 6/25/26  In re A.J. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.J. et al., Persons Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br> v. <br> C.J., <br><br> Defendant and Appellant. | A174466 <br><br> (Humboldt County Super. Ct. Nos. JV2300090, JV2300091, JV2300093) |

In May 2023, the Humboldt County Department of Health and Human Services (department) filed juvenile dependency petitions with respect to four children of appellant C.J. (mother), alleging that the children were at risk of harm because of ongoing domestic violence between mother and Alvaro E.–R. (father).  After a physical altercation between the parents in March 2025, mother sought a juvenile restraining order protecting her and the children from father, and father sought a reciprocal restraining order protecting him from mother.  After an eight-day hearing, the juvenile court issued mutual restraining orders, but denied mother's request that her order include her children as protected persons.  Mother argues that such denial was error, and

1

that the juvenile court failed to make sufficiently detailed factual findings in support of its orders under Family Code section 6305. We affirm.

## BACKGROUND

Appellant C.J. (mother) is the mother of four children with three different fathers: two daughters, A.J. and V.J., whose biological father is Alvaro E.–R. (father);[1] and two sons, R.O. and O.J.

### The Initial Petitions, Jurisdiction, and Detention

On May 18, 2023, the Humboldt County Department of Health and Human Services (department) filed juvenile dependency petitions pursuant to Welfare and Institutions Code[2] section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling) with respect to each of O.J., A.J., and V.J. (then twelve, seven, and two years old, respectively).[3] The petitions alleged that in February 2023, A.J. "was present during [a] domestic violence incident between the parents. During the incident, [A.J.]'s wrist was fractured. The parent's [*sic*] narrative of the incident does not match. The father reports he does not know how the child's wrist was broken."

According to the detention report filed by the department the next day, the petitions were prompted by a referral indicating that "[mother] was trying to leave the house with [A.J.] and [father] grabbed the child's arm and fractured it. [Father] was arrested for domestic violence and felony child endangerment. It is reported that [mother] sustained some injuries. It is not

---

[1]     The juvenile court elevated father to presumed status in July 2023.

[2]     Further undesignated statutory references are to the Welfare and Institutions Code.

[3]     The department also filed a petition with respect to R.O., but he turned 18 years old in November of 2024, and mother's brief does not discuss him further.

2

known if [mother] or [father] were under the influence of any substances at the time of the incident. [Father] was given an immediate move-out order and [mother] was granted an emergency protective order (EPO) that expired five (5) days after the EPO was signed. The child was taken to the hospital by [mother]."

On May 19, the juvenile court ordered the children detained and placed with their maternal grandmother. Both parents were granted supervised visitation two times per week for a total of four hours each.

On October 18, a jurisdictional hearing was held at which the juvenile court sustained the petitions and found their allegations true.

On December 6, a dispositional hearing was held and the department filed a disposition report, dated October 4. The report noted that the department had prepared "safety plans in response to concerns about the parents' domestic violence and the children being exposed to the parents' violence," but those plans "were not successful, as the parents continued to engage in domestic violence behaviors." With respect to visitation, the report indicated that "father loves his children and has been consistent with attending visits." In particular, father had attended 14 visits since July 7, 2023, and "[t]here [were] no reported concerns for visits between the children and their father," although A.J. did refuse to attend two visits with her father in September.

At the hearing, the juvenile court adjudged all three children dependents and returned them to their mother's custody under a plan of family maintenance.

**2024 In-Home Status Review**

On May 24, 2024, with an in-home status review hearing then set for June 11, the department filed a report recommending that jurisdiction be

3

terminated because mother had "consistently demonstrated her ability to safely and appropriately [parent] her children during this reporting. She has completed her case plan goals and has provided a violence-free household for herself and her children."

The review hearing was continued several times, and on August 28, before it had taken place, the department filed an "at issue memorandum," changing its recommendation that the dependencies be terminated, and recommending instead that the case remain open for another six months. The memorandum explained that it had come to the department's attention "that the parents have a complicated, co-dependent relationship, and due to their history of domestic violence, it did not feel safe to close the case and terminate dependency as was the initial recommendation," and that there were "issues regarding visitation" that the department wanted resolved first.

At the review hearing on September 30, the juvenile court followed the department's recommendation by maintaining the children as dependents and continuing family maintenance services. A further family maintenance review hearing was set for April 1, 2025.

**February 2025 Supplemental Petitions**

On February 10, 2025, the department filed supplemental petitions pursuant to section 387 with respect to the children, alleging that "[t]he prior disposition of placing the children in the care of mother, with the father not to be in the home, has failed to protect the children from the negative effects of ongoing interpartner violence . . . ." The petitions alleged that A.J. "reports ongoing fighting between her parents that has caused her severe emotional harm[,] including crying uncontrollably and vomiting," that V.J. "has been expelled from preschool and . . . [O.J.] has left the family home to escape the toxic environment created by [mother and father]," concluding that "mother's

4

failure to acknowledge the effects the violence has on her children and the father's failure to follow court orders and continu[ing] to engage [in interpartner violence] with . . . mother in front of the children places the children at ongoing risk of harm."

In its detention report filed the next day, the department indicated that A.J. and V.J. had been taken into protective custody on February 5, after the department received a referral "regarding the emotional abuse of [A.J.] by her parents. . . . [A.J.] does not feel safe with her father being in the home. [She] described having symptoms of anxiety manifested as vomiting and feeling physically ill. [A.J.] reported in the last two weeks, her mother told her not to tell anyone about her father being in the home or she would break up her family and go into foster care. . . . [¶] . . . . [A.J.] hears her parents arguing so loud that she cannot hear. . . . [¶] . . . . There were various inciden[ts] where the father physically harmed the mother in the presence of the children." A.J. "had been hospitalized for mental health concerns due to the impacts of the mother and father's actions of violence," and "has had past suicidal ideations." And O.J. was "so traumatized by the domestic violence in the home he has moved himself to the home of the [maternal grandmother]."

At the February 11 detention hearing, the juvenile court ordered A.J. and V.J. detained and granted mother supervised visitation. And after a jurisdictional hearing held on March 5 and 7, the court sustained the allegations of the supplemental petitions.[4]

On April 29, the department prepared a disposition report with respect to A.J. and V.J., a report that was followed by several addenda. With respect to father's visitation, it indicated he had "abruptly" stopped attending visits with his daughters in November 2024. In February 2025, father told a social

---

[4] The juvenile court later set a dispositional hearing for October 14.

5

worker that he did not want to have supervised visitation, and as of the writing of the report, had not participated in any visitation with his daughters.[5]

On May 12, A.J. told a social worker that she did not want to have visits with her father again, and that she does not "feel safe" around her father " '[b]ecause of all the things he does to my mom.' " She added that she does not want V.J. to visit with her father without her, and "if [V.J.] has to go, I will go to protect my sister."

Although V.J. had "historically" enjoyed visits with her father, as part of a behavioral health intake assessment in May, she " 'showed significant fear' " of her father, "reported that her father has physically hurt her and that he has hurt her mother ten times, and she slowly recalled each incident as she counted on her fingers." She said she was "afraid to see her dad because she has seen him hurt her mom" and "wants him to stay away from her family."

The report's fourth addendum, dated September 17, indicated that in July 2025, A.J. had reported sexual abuse "between 5-10 times" by her paternal half-brother to a social worker. She also disclosed that the same half-brother had abused his older sister. A.J. continued to see her half-brother after these events, as father often brought him to their visits, despite a social worker telling father that A.J. did not want him present.

The report ultimately recommended that the court find the prior disposition ineffective and set a six-month review hearing. And it recommended that father's visits with his daughters "be deemed detrimental," both because they "will be emotionally and mentally

---

[5]     At a dispositional hearing on May 1, O.J. was removed from mother's care and placed with his maternal grandmother, with a six-month review hearing set for October 30, 2025.

6

detrimental" to both children and because "there is reason to believe that the father does not have the ability or desire to change nor understand his daughters['] concerns related to his visits."

**Mother's Request for Restraining Order**

Meanwhile, on March 19, mother filed a request for a juvenile restraining order protecting herself and her children from father. Her request explained: "On or about March 14, 2025, [father] came to my house. He snapped and grabbed my arm hard, then choked me with his hands around my neck. He punched me hard in the stomach, stepped on my face and tried to suffocate me with a pillow. I asked him to leave my home and he refused. . . . I led him downstairs and continued to ask him to leave. [Father] said he's sure the neighbors would call the police because I'm loud and dramatic. I opened the front door (around 3 am) and I told him to call the police himself. Finally, he did and I continued to keep telling him to leave my house. While he was on the phone I was asking him to leave and get out. I yelled the address for them and to please help me. Law enforcement arrived and arrested him as soon as they saw me."

On April 16, father filed his response: "I do not agree that there needs to be a restraining order against me to protect my daughters. There is no reason to protect them from me as [mother's] accusations are unfounded and untrue. [¶] I have visitation with my daughters through the child welfare agency which can be supervised or unsupervised or they can be placed with me. I have participated in visits with my daughters since this matter came before the court. [¶] . . . [¶] I do not agree to a stay-away order for my two daughters as I have visitation and a relationship with them. Child welfare department is overseeing this case and my contact with my daughters. . . . [¶] . . . [¶]

7

"The actual events of that evening are as follows: [Mother] begged me to come over to her house. I did and was asleep at approximately 2:00 a.m. I was in bed in the bedroom on the third floor. She woke me up and began asking me about someone I was seeing. She continued to ask questions and then started yelling. She would not stop yelling and accusing me. I needed to go to work in the morning, so I told her I was going to leave. I started to get dressed and she followed me down the staircase. She grabbed the back of my hooded sweatshirt and caused me to fall backwards. She continued to yell and scream at me not to leave. Once I was down one staircase I was trying to gather my things. She stood in front of me and pushed me backwards. She continuously blocked me from leaving. She threw herself at me and on the floor. She begged me not to leave. [¶] I made my way down another staircase and while walking down the stairs, [mother] had a hold of my leg and would not let go even as I walked down the stairs. She stood in front of the door trying to block it. She pulled a large vase in front of the door and sat in it to keep me from leaving. I turned to the other door, which is the garage door to leave."

**Father's Request for Restraining Order**

On April 25, father filed a request for a juvenile restraining order protecting him from mother. After recounting his version of the events of March 14, as described above, his request continued: "I called the police because [mother] was screaming and all of her neighbors could hear. . . . When the police arrived, they spoke to me and to [mother]. [Mother] lied to the police and told them I pushed her and tried to choke her with a plastic bag and that I caused her lip to have blood on it. Her rendition is completely false. [¶] [Mother] filed a temporary restraining order against me and since that time has continued to call me (from blocked numbers, burner phones or

other people's phones) early in the morning and continuously. [¶] [Mother] continuously texts, calls and follows me when I am out in public or parked at my house. . . . She has always been extremely obsessive and jealous with me and tries to control where I go and who I am friends with. She has caused this kind of drama and police interaction in the past and there are police reports that show this behavior. [¶] As seen in the attached Exhibits, [mother] has been harassing, stalking, and otherwise interfering in my life for well over the past year. The exhibits are only a portion of the texts and phone calls I receive from her on a daily basis." Attached were two exhibits; the first showing many missed calls from mother on March 4, 7, and 11–13, and the second including text messages father described as mother "messaging [a friend to] get info on someone she suspected I was seeing."

### The Hearing on the Parents' Mutual Requests

The juvenile court held a hearing on the parents' requests over eight days in August and September of 2025. The witnesses were father, mother, three supervisors of father's visits with his daughters, and father's mother.

#### Father's Testimony[6]

Father testified to his version of the events of March 13 and 14, as set forth above, but denied causing mother any injuries. Mother was violent with him a "handful" or "five" times, but the children were only present for the incident in February 2023 when A.J. "got hurt when she got dragged out of the house."

Father and mother had "many" physical altercations, "[u]nfortunately, sometimes" in front of the children, and that mother initiated them all. He denied responsibility for A.J.'s wrist injury during the February 2023,

---

[6] Father first testified when called by mother's counsel pursuant to Evidence Code section 776 and later as part of his own case. Our summary includes both parts of his testimony.

9

altercation, claiming that he "didn't touch my daughter at all that day" and that mother had taken responsibility for the injury: "She had said that more than likely it was from her dragging her. She's like, 'I'm pretty sure I accidentally did that to her.' "

According to father, A.J. and V.J. were "very affectionate" and did not express any fear of him during their visits.

Mother would call father "repeatedly, essentially harassing me," which was the "norm whenever I didn't answer her." When he blocked her number, she called him from numbers with no caller ID, calls he estimated numbered "in the thousands" and were anywhere from 50 to 300 times "back to back."

### Mother's Testimony

Mother testified that on the night of March 13, father came to her home "for no specific reason," and that "he was coming over every single night since the children were removed from me." She "believe[d]" she made repeated phone calls to father that evening because "if I didn't check in with him and he didn't know where I was and how long it took me to get there, he would get very upset," and they had had "a million fights and arguments about that." Father said mother was "annoying" because of the phone calls, but she responded, "how am I supposed to let you know where I'm at if you get upset about not knowing where I am?" Mother would spend the "whole entire night on FaceTime" with father "[w]henever we were talking at the moment, every night he wasn't with me."

On the night of March 13, mother and father were discussing mother's work as a medical assistant and the conversation "got heated." Mother went upstairs, took a shower, and returned to find father "laying on the couch in the same exact spot when I left him." After asking father if he wanted to come to bed, mother "nudged" him "a few more times" and he "snapped." He

10

"grabbed [mother's] arm really hard," "pu[t] his hands around [her] neck," and "punch[ed] [her] in the stomach really, really hard." Father pulled a plastic shopping bag "tight so it was straight line. Like, he used it kind of like a rope to hold over my neck with one hand on each side while I was on my back." Eventually father called 911 and left. Mother estimated the altercation went on for "[m]aybe an hour."

Mother testified that father had "gotten physical" with her, "whether it's punching me or twisting my hands or my arms," "probably over 2 to 300 times" over the court of their ten-year relationship. And she testified that father was physically abusive with the children about "[o]nce every month," specifically by "spanking" them.

### Visitation Supervisors' Testimony

Three witnesses testified who had supervised father's visits with his daughters: Michelle Malcom-Looney, who did so from October 2023 to July or August 2024; Elizabeth Stotzer, who supervised father's visits during "most of 2024"; and Emily Fryer, who supervised father's visits "maybe . . . ten times" in 2024.

Looney described father's demeanor during visits as "fine and loving" toward V.J. and "[h]appy, loving, positive, happy to see her" toward A.J. She noted that he was "always happy to see his girls, from what I remember. They were usually happy to see him, too" and there was "nothing that seemed, you know, to raise suspicions or out of the ordinary." V.J. was affectionate with father, and "would seek him out for comfort, for hugs, for kisses, to be, like, cuddled." Although A.J. occasionally did not want to visit with father, "once . . . the visits . . . settled in . . . she appeared happy to be there and she would be smiling and hold his hand and give him a hug at the end."

11

Stoltzer described father's visits with the children as "[p]erfectly fine . . . we had no safety concerns . . . I have . . . a five-point system when I'm assessing a visit, and that is like if the parent during the visit is affectionate, if they are interacting with their child, if they are monitoring their child appropriately, if the engagement is positive. And he did all those things. So he would always monitor appropriately. He was engaged. He interacted. The interaction and the engagement were positive. He was safety minded." A.J. expressed affection toward father, and Stoltzer characterized his interactions with the children as "overall positive." At some point before July of 2024, she recommended that father have unsupervised visits.

Fryer described father's demeanor during the ten visits she supervised as "[p]ositive. He would bring food, made sure that there were activities to do. He was very engaged with his daughters." Father expressed affection toward his daughters through "[l]oving words" and hugs, and A.J. expressed affection back with "loving words" and "laughter." A.J. was "mostly engaging" with father, played games and had snacks with him, and gave him "[h]ugs good bye and hugs hello." V.J.'s demeanor toward her father was "[e]ngaging, loving, hugs, happy to see her dad."

**The Juvenile Court's Ruling**

On September 29, after the hearing concluded, the juvenile court ruled as follows:

"I have had time to read and consider all of the closing arguments, and I am prepared to rule at this time. And I do agree with minor's counsel, Ms. Balden, that there is sufficient evidence for the Court to grant mutual restraining orders for a period of three years, and those mutual restraining orders will issue today. They will be very close to mirror images of each other.

12

"Also, by way of explanation, the Court does find there is clear evidence of physical violence against mother by father, and there is clear evidence of clear evidence of physical violence against mother by father, and there is clear evidence of . . . harassment of father by mother, specifically mother has made numerous, and for a period of time, continuous phone calls and texts to father.

"The Court does find that the children will not be—the children will not be protected persons under mother's request as the Court finds there is insufficient evidence indicating the children's safety might be in jeopardy or endangered without their inclusion of the restraining orders.

"So, as far as the restraining orders, mutual restraining orders."

Mutual three-year restraining orders issued that same day, requiring mother and father to stay at least 100 yards away from each other's person, home, job, and vehicle, until September 29, 2028.

Mother filed a notice of appeal.[7]

## DISCUSSION

### The Juvenile Court Did Not Err In Declining to Include the Children on Mother's Restraining Order

#### Applicable Law

Section 213.5, subdivision (a), provides in relevant part, "[a]fter a petition has been filed pursuant to Section 311 to declare a child a dependent child . . . the juvenile court has exclusive jurisdiction to issue ex parte orders (1) enjoining a person from molesting, attacking, striking, stalking,

---

[7] On February 2, 2026, in lieu of filing its own brief, the department filed a joinder in all of mother's opening brief. (See Cal. Rules of Court, rule 8.200(a)(5).) On April 13, father's appointed counsel filed a respondent's brief.

13

threatening, sexually assaulting, battering, harassing, telephoning . . . or disturbing the peace of the child or any other child in the household . . . A court may also issue an ex parte order enjoining a person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning . . . or disturbing the peace of any parent, legal guardian, or current caretaker of the child, . . . upon application in the manner provided by Section 527 of the Code of Civil Procedure or, if related to domestic violence, in the manner provided by Section 6300 of the Family Code." (§ 213.5, subd. (a).)

"Given the cross-reference in section 213.5 to Family Code section 6300, courts have analogized the issuance of a section 213.5 restraining order to the issuance of protective orders under the Domestic Violence Prevention Act (DVPA), Family Code section 6200 et seq. [Citations.]" (*In re A.P.* (2024) 103 Cal.App.5th 1137, 1143 (*A.P.*).) As under the analogous provision of the DVPA, Family Code section 6340, issuance of a restraining order under section 213.5 does not require evidence the person being restrained "previously molested, attacked, struck, sexually assaulted, stalked, or battered the child." (*In re B.S.* (2009) 172 Cal.App.4th 183, 193 (*B.S.*); see *A.P.*, *supra*, p. 1143; *In re S.G.* (2021) 71 Cal.App.5th 654, 671 (*S.G.*).) Nevertheless, "[i]ssuance of the restraining order [is] not proper unless failure to issue the order might jeopardize the safety of the children." (*In re C.Q.* (2013) 219 Cal.App.4th 355, 365; *In re N.L.* (2015) 236 Cal.App.4th 1460, 1467.)

Also relevant here is Family Code section 6305, which "permits trial courts to issue mutual restraining orders, but limits them to specific circumstances." (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 979.) In particular, Family Code section 6305, subdivision (a) provides that the court "shall not"

14

not issue a mutual restraining order unless "both" of the following apply: "(1) Both parties personally appear and each party presents written evidence of abuse or domestic violence in an application for relief . . . ," and "(2) The court makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense."[8]

**Standard of Review**

We review the juvenile court's decision whether to grant a restraining order for abuse of discretion and the factual findings supporting that decision for substantial evidence. (See *A.P., supra,* 103 Cal.App.5th at p. 1142; *S.G., supra,* 71 Cal.App.5th at pp. 670–671.) When reviewing for substantial evidence, " ' "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could

---

[8]      Family Code section 6305, subdivision (b) further provides that, "[f]or purposes of subdivision (a), in determining if both parties acted primarily as aggressors, the court shall consider the provisions concerning dominant aggressors set forth in paragraph (3) of subdivision (c) of Section 836 of the Penal Code." These factors are "(A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence between the persons involved, and (D) whether either person involved acted in self-defense." (Pen. Code, § 836, subd. (c)(3).)

find [that the order is appropriate]." ' " ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773; *A.P.*, p. 1142.)

But "[t]he party seeking a restraining order bears the burden of establishing the circumstances justifying the order." (*Jan F. v. Natalie F.* (2023) 96 Cal.App.5th 583, 593.) And "[t]he substantial evidence standard of review takes on a unique formulation where, as here, 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals.' (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' (*In re I.W.*, *supra*, at p. 1528.) Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' (*Ibid.*)" (*S.G.*, *supra*, 71 Cal.App.5th at p. 671; see *A.P.*, *supra*, 103 Cal.App.5th at p. 1142; *In re Marriage of Diamond* (2024) 106 Cal.App.5th 550, 566–567 [noting that such burden is "almost impossible" to carry].)

### Mother's Evidence Does Not Compel Inclusion of the Children on Mother's Restraining Order As a Matter of Law

Mother acknowledges the "almost impossible" burden she must carry to establish error in the juvenile court's decision not to include her children as protected persons on her restraining order against father, but nevertheless contends that "the evidence in the record compels a finding in her favor as a matter of law." We disagree.

In support, she first asserts that the initial petitions "expressly reference[] an incident in February 2023, when father broke [A.J.]'s wrist,"

noting that the allegations of the petitions were subsequently found true. She next points to several statements the three children made to social workers in February and May 2025, including that they were afraid of father and did not feel safe with him in the home because of his abuse of their mother.[9]  Mother discusses A.J.'s July 2025 disclosure that she had been sexually abused by her paternal half-brother, noting that the department questioned father's judgment in bringing that half-brother to visits with A.J. despite being "aware that his other daughter . . . had undergone a forensic interview due to her disclosure of sexual abuse by" that same brother. Finally, mother asserts that she "testified truthfully and contritely" at the hearing on her restraining order request that father had been physically abusive to the children by "spank[ing]" them, "about once a month" over the course of their ten-year relationship.

To begin with, mother's contention that the initial petitions alleged that "father broke [A.J.]'s wrist" is not accurate.  Rather, the petitions alleged (under § 300, subd. (b)(1)) that "the parents were involved in a domestic violence dispute that led to [A.J.]'s wrist being fractured"; and (under § 300, subd. (j)) that the children were present "during [a] domestic violence incident between the parents . . . [A.J.]'s wrist was fractured," that the parents' "narrative[s] of the incident d[id] not match," and father "report[ed] he does not know how the child's wrist was broken."  The juvenile court could find these allegations true without determining whether it was mother or

---

[9]      In particular, in February 2023, O.J. told a social worker that he "he is scared of what [father] and [father's] son will do" to him.  And in February 2025, O.J. stated that he "does not feel safe in the home when the father is there," A.J. stated "she does not feel safe with her father being in the home," and V.J. stated that "she is afraid to see her dad because she has seen him hurt her mom."

17

father who injured A.J.'s wrist; the alleged substantial risk of harm was "due to . . . ongoing exposure to domestic violence between the parents." (See § 300, subds. (b)(1), (j).)

In any event, even evidence conclusively establishing past physical abuse does not compel the juvenile court to issue a restraining order. (See *A.P.*, *supra,* 103 Cal.App.5th at pp. 1146–1147 ["[c]ourts have discretion to issue a domestic violence restraining order based only on past abuse"]; *In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1499, fn. 8 ["the fact that a trial court finds past abuse does not require that the court issue a restraining order"]; *Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 116.)

In arguing that the allegations of the petitions require the childrens' inclusion on her restraining order, Mother relies on language from *B.S.*, *supra*, 172 Cal.App.4th at p. 193, stating that "evidence that the restrained person previously molested, attacked, struck, sexually assaulted, stalked or battered the child is certainly sufficient" to support issuing such an order. (*Id*. at p. 193.) Such reliance is unavailing. In *B.S.*, the Court of Appeal affirmed issuance of a restraining order protecting mother and B.S. from B.S.'s father after an altercation in which the father "grabbed the mother and 'threw her down on top of' B.S.," because the court "could reasonably infer, from the father's tendency to resort to violence as well as from his evident lack of impulse control, that he might be a threat to B.S.'s safety." (*Id*. at pp. 186–187, 194.) But the fact that evidence is sufficient to support issuance of a restraining order plainly does not mean that same evidence *compels* the juvenile court to issue such an order. *B.S.* acknowledged as much, noting that "[e]ven assuming [the] opposite inference might be equally reasonable, we are not authorized to second-guess the juvenile court on this point." (*Id*. at p. 194; see *In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780 [" ' "When

18

two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court" ' "].)[10]

While we do not intend to minimize the troubling nature of the evidence mother relies on, we must observe that it was not "uncontradicted." (*S.G.*, *supra*, 71 Cal.App.5th at p. 671.)  As noted, father testified that he "didn't touch [A.J.] at all [the] day" her wrist was injured, and that mother had subsequently told him she was "pretty sure" she was responsible for A.J.'s injuries.  He denied initiating any of his physical altercations with mother.  And although father's visits with his daughters apparently ended in November 2024, he testified that his daughters were "very affectionate" with him during them, testimony that was corroborated by three supervisors of that visitation.  As mother's brief acknowledges, there was no evidence that father was aware of the alleged sexual abuse of A.J. by his son.  Finally, despite mother's characterization of her own testimony as "truthful[]," the question of her credibility and the weight to be afforded her testimony were for the juvenile court to resolve, and we cannot revisit its answers on appeal. (See, e.g., *In re Caden C.* (2021) 11 Cal.5th 614, 640 ["In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' "]; *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780 ["[w]e defer to the trial court's credibility resolutions and do not reweigh the evidence"].)

---

10      For the same reasons, mother's further reliance on *In re Bruno* M. (2018) 28 Cal.App.5th 990, which affirmed the juvenile court's decision to include children on a restraining order where they witnessed physical altercations between their parents and "expressed fear and sadness" afterwards, does not avail her.  (*Id*. at pp. 997–998.)

In sum and in short—and even under ordinary principles of substantial evidence review—the existence of evidence that would have supported inclusion of the children on mother's restraining order does not require reversal. (See *S.G.*, *supra*, 71 Cal.App.5th at p. 672 ["merely conflicting evidence" does not "support an insufficiency of the evidence claim . . . let alone a claim that the evidence . . . *compels* resolution of Mother's request in her favor"]; *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 ["The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment"]; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 [substantial evidence review does not require reversal merely because "the trial court might have reached a different result had it believed other evidence"].)

Finally, mother's reliance on *K.T. v. E.S.* (2025) 109 Cal.App.5th 1114 (*K.T.*) is unavailing. There, K.T. sought a domestic violence restraining order under the DVPA protecting her and her three daughters from her ex-partner E.S. (*K.T.*, p. 1119.) Her request explained with respect to the children that E.S. had physically abused them, abused her in front of them, and had abducted them from Texas to California told her " 'he would only return them to me if I get back with him.' "[11] (*Id.* at pp. 1119, 1122.)

---

[11] As mother acknowledges, the facts of *K.T.* were much more "severe" than those here. According to K.T.'s request, E.S. was a human trafficker who had taken her from Honduras to Mexico when she was a minor, and she was subsequently his "victim for over seven years, experiencing physical injuries, rape, fear, anxiety, and trauma." (*K.T.*, p. 1119.) E.S. "switched [K.T.'s birth control] pills for vitamins," "viciously hit the children on numerous occasions," and "threatened to kill K.T. if she ever left." (*Id.* at p. 1120.)

The trial court issued a permanent restraining order protecting K.T. from E.S. without including the children, after inaccurately stating that "the children were not listed as protected parties under [K.T.'s] current request" and that "there has been no credible evidence . . . regarding any physical or sexual abuse that has been sustained by the children . . . ." (*K.T.*, *supra*, pp. 1125–1126.) The Court of Appeal reversed, both because "[t]he record dispositively show[ed] the trial court was factually mistaken" as to whether K.T. had included her children in her request (*id.* at pp. 1128–1129), and the court misapplied the law by "incorrectly limit[ing] its inquiry to whether the children were physically or sexually abused by E.S." (*id.* at p. 1130) rather than requiring only a "showing of 'good cause' " under the language of Family Code section 6320, subdivision (a). (*K.T.*, *supra*, pp. 1125–1126.) Because K.T.'s declaration and testimony provided "undisputed evidence that the children were present and exposed" to domestic violence between their parents, and the court's comments at the hearing made clear it found that evidence "credible and true," *K.T.* found that good cause for their inclusion on the restraining order and directed the trial court to so modify the order on remand. (*Id.* at pp. 1131–1132.)

*K.T.* is distinguishable. Unlike K.T., mother makes no argument that the juvenile court made any error of fact nor any error of law in denying her request to list her children as protected persons. (*K.T.*, *supra*, 109 Cal.App.5th at p. 1128.) But more importantly, and as already discussed, mother's evidence here was not "undisputed," nor is there any clear indication the juvenile court found it "credible and true." (*Id.* at p. 1131.) Unlike *K.T.*, this case thus presented conflicting factual narratives to be resolved by the juvenile court, and that case is thus inapposite.

21

**Mother Has Failed to Demonstrate Prejudice With Respect to the Alleged Violation of Family Code Section 6305**

Mother's second argument is that Family Code section 6305 applied to the juvenile court's issuance of mutual restraining orders under section 213.5, and that the court failed to make sufficiently "detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense," as required by that statute. (Fam. Code, § 6305, subd. (a)(2).) In particular, mother argues that the juvenile court's oral explanation of its rulings—what she styles a "curtly rendered . . . two-sentence opinion"—does not provide " 'detailed findings of fact' " because it makes no mention of Family Code section 6305, nor of the terms "primary aggressor, dominant aggressors, or self-defense."

Although mother cites no authority so holding, we will assume without deciding that the requirements of Family Code section 6305 apply to a juvenile court's issuance of mutual restraining orders under section 213.5 by analogy to the DVPA. (See *A.P.*, *supra*, 103 Cal.App.5th at p. 1143.) But we need not decide whether the juvenile court's findings comply with Family Code section 6305 because mother has not offered any argument that the alleged error was prejudicial.[12]

Article VI, section 13 of the California Constitution "precludes reversal for any error as to any matter of procedure, unless, after an examination of

---

[12] On reply, mother cites *In re Marriage of Hoch* (2026) 119 Cal.App.5th 80, decided after the filing of her opening brief: " 'If a court issues a mutual restraining order without making the requisite findings under [Family Code] section 6305, the order is voidable.' " (*In re Marriage of Hoch*, *supra*, 119 Cal.App.5th at p. 103; *Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 368 [same].) But even voidable orders, i.e., "acts in excess of jurisdiction," "are subject to harmless error analysis, that is, they support a reversal of the judgment only upon a showing of prejudice. (See *People v. Williams* (2006) 40 Cal.4th 287, 301.)" (*LAOSD Asbestos Cases* (2018) 28 Cal.App.5th 862, 871.)

the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108–1109; see also *id.* at p. 1108 [concluding that "failing to issue a requested statement of decision is not reversible per se, but is subject to harmless error review"].) "The burden is on the appellant in every case to show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice." (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["[O]ur duty to examine the entire cause arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. . . . [T]he appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice"]; *Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77.)

Mother asks that we reverse and remand for the juvenile court to conduct a "new hearing," and argues that "remand and correction is necessary to ensure the court complies with not only the *letter* of Family Code [section] 6305, but the *spirit* of Family Code § 6305, too," with citation to *Monterroso v. Moran* (2006) 135 Cal.App.4th 732. (See *Monterroso v. Moran*, *supra*, 135 Cal.App.4th at pp. 736–738 [reversing mutual restraining orders where trial court made "no findings of fact" and "exhort[ing] [trial courts] to recognize that an improvidently issued mutual restraining order may adversely impact victims of domestic violence and continue their victimization"].) But she offers no argument whatsoever that the juvenile court's failure to issue more detailed findings of fact in this case resulted in a "miscarriage of justice," because there is a reasonable probability of a different result absent the alleged error, or otherwise. (See *People v. Watson*

23

(1956) 46 Cal.2d 818, 837.)  Even assuming error, mother has failed to carry her burden to demonstrate prejudice requiring reversal.

## DISPOSITION

The orders are affirmed.

_____

                         RICHMAN, ACTING P. J.



We concur.



_____

MILLER, J.



_____

DESAUTELS, J.



(A174466N)


25